1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                        **DISTRICT OF NEVADA**

8

9   EDWARD LEE BEETS,                    )

10              Petitioner,              )        2:04-CV-00085-KJD-GWF
                                         )
11   vs.                                 )
                                         )        **ORDER**
12   E.K. McDANIEL, *et al.*,            )
                                         )
13              Respondents.            )
                                         )
14  _____/

15   I.     Introduction

16              On May 16, 2006, petitioner Edward Lee Beets filed a Motion for Leave to Conduct

17   Discovery (docket #18), along with seven volumes of exhibits in support of the motion (docket #19-

18   40).  On September 28, 2006, respondents filed an opposition to the discovery motion (docket #47)

19   together with a Motion to Dismiss Petition for Writ of Habeas Corpus (docket #46).  On December

20   1, 2006, Beets filed an opposition to the respondents' motion to dismiss (docket #49) and a reply to

21   the respondents' opposition to his discovery motion (docket #50).  Respondents have not filed a

22   reply to Beets's opposition to the motion to dismiss.  Having considered all of the foregoing

23   submissions, the court will grant Beets's discovery motion in part and deny respondents' motion to

24   dismiss.

25   II.    Background

26              In its opinion on petitioner's direct appeal, the Nevada Supreme Court described the

factual background of this case as follows:[1]

Appellant Edward Beets was Vanita Hames' boyfriend for approximately four months. Sometime after Christmas 1988, Vanita broke off her relationship with appellant. Vanita lived in North Las Vegas with her mother, Oretha Hames, aged 71, her daughter, Nicole, aged 7, and her son, Christian, aged 1-1/2.

At approximately 3:00 or 4:00 a.m. on March 10, 1989, Vanita awoke to find appellant standing over her. Vanita asked appellant what he was doing there and, when he did not reply, she ran out of her room to the kitchen to use the telephone. The telephone did not work as the telephone lines leading into the home had been cut.

Vanita then saw appellant walk toward her, enter her bedroom, and re-emerge with a pillowcase which had been in the linen closet. Appellant withdrew a hammer from the pillowcase, which Vanita recognized as one she kept in a kitchen drawer with other tools. Appellant chased Vanita through the living room, caught her and hit her on her back two or three times with the hammer. Vanita heard her mother, Oretha, yell, "What's going on in there." Oretha then opened her bedroom door, saw appellant, and told him to stop and get out. When Oretha walked toward appellant, he hit her with the hammer once on the top part of her body and she fell.

Vanita crawled around the furniture in an attempt to get away from appellant, but he caught up with her in the hallway and dragged her into the bathroom. Vanita was crying and screaming and appellant told her to be quiet before she woke up the children. Vanita could hear her mother moaning and having difficulty breathing. Inside the bathroom, appellant again hit Vanita with the hammer, including a blow to the back and a blow which broke her arm. Appellant then tied Vanita's hands and feet with a torn sheet and then left, closing the door. Vanita was unable to get loose from the bindings.

About ten minutes later, appellant returned to the bathroom with a sofa cushion which he placed under Vanita's broken arm. Appellant then untied her, opened his fly, and took off her underpants. Appellant knelt between Vanita's legs and waved the hammer around as if he was going to hit her between her legs. He then turned the end of the hammer around and stuck the handle up her vagina.

Appellant left the bathroom with the door open and returned about a minute later with a kitchen knife. Appellant told Vanita he was going to kill her and then himself. Appellant knelt in front of her and, with both hands on the knife, stabbed her near her left breast. Appellant threw the knife down, turned off the bathroom light, and left, closing the door.

About ten minutes later, Vanita heard appellant walk toward the children's room. Vanita felt around for the knife, left the bathroom, and lunged at appellant with the knife. Appellant knocked the knife out of her hand and hit her across the face with

_____

[1] The court sets forth this background information, as stated by the Nevada Supreme Court, only to provide the context for this order. The court does not intend to make any finding with respect to the facts stated in this section of this order.

2

1    his fist. He again dragged Vanita to the bathroom, pushed her down and, with the
     hammer, hit her on the knees and on the side of her head. Appellant closed the
2    bathroom door and left. After a few minutes, Vanita heard her daughter crying and
     heard her say, "No, no."
3
           Vanita got up and went to her daughter's room and found Nicole lying on the
4    bed with her ankles tied. Vanita went into the kitchen to get a knife to cut the
     bindings. Vanita gave the knife to Nicole, who cut the bindings, and told Nicole to go
5    to a neighbor's house for help. Vanita then went into the living room where she found
     her mother lying face down on the floor. She turned her over and knew she was dead.
6
           Nicole testified regarding appellant's acts in her bedroom. Appellant entered
7    Nicole's bedroom with no clothes on. He climbed into bed with Nicole and removed
     her underwear. Appellant then laid on top of Nicole and stuck his finger and penis in
8    her vagina. Appellant left the room and returned a few seconds later and tied her arms
     and legs. Appellant then left again.
9
           As a result of her injuries, Vanita still could not lift her wrist at trial on August
10   1, 1989, due to nerve damage. Vanita testified she did not know if she would be able
     to use her wrist again.
11
           Appellant was charged with the following: burglary; first degree murder with
12   use of a deadly weapon, victim 65 years of age or older; attempted murder with use of
     a deadly weapon; mayhem with use of a deadly weapon; first degree kidnaping with
13   use of a deadly weapon; sexual assault with use of a deadly weapon; and two counts
     of sexual assault with a minor.
14
           At the close of the State's case at trial, appellant moved to dismiss the
15   kidnaping and mayhem charges. The district court denied the motion as to both
     charges. The jury found appellant guilty on all counts. At the penalty hearing, the
16   State introduced two judgments of conviction, one for robbery in April, 1980, and one
     for burglary in April, 1985. The defense called witnesses who testified that appellant
17   suffered several serious head wounds as a child and testified regarding appellant's
     good character.
18
           The jury was deadlocked and unable to reach a verdict after the penalty phase.
19   In an order filed August 15, 1989, we ordered a three judge panel to conduct a penalty
     hearing pursuant to NRS 175.556. At the second penalty hearing, the judges indicated
20   that they had reviewed the transcripts of the previous proceedings, both the guilt and
     penalty phases.
21
           The three judge panel found no mitigating circumstances and the following
22   four aggravating circumstances: (1) the murder was committed by the defendant while
     under a sentence of imprisonment, to wit: Burglary; (2) the murder was committed by
23   the defendant who was previously convicted of a felony involving the use or threat of
     violence to another, to wit: Robbery; (3) the murder was committed while the
24   defendant was engaged in the commission of sexual assault; and (4) the murder was
     committed while the defendant was engaged in the commission of burglary. On
25   November 7, 1989, appellant was sentenced to death.

26   *Beets v. State*, 107 Nev. 957, 959-961, 821 P.2d 1044, 1046-47 (1991) (footnotes omitted).  The

                                          3

Nevada Supreme Court affirmed Beets's conviction as to all counts and his death sentence. *Id.*, 107 Nev. at 965, 821 P.2d at 1050.

On September 3, 1993, Beets filed a petition for writ of habeas corpus in the Eighth Judicial District Court for Nevada, the court in which he was convicted. Within the context of that proceeding, Beets filed a motion for partial summary judgment in which he argued that his death sentence is invalid because the Nevada Supreme Court's decision on his direct appeal did not include an opinion in which a majority of the court concurred that the penalty-phase jury's consideration of improper aggravating circumstances amounted to harmless error. The state district court denied the motion; and, the Nevada Supreme Court rejected, on jurisdictional grounds, an appeal of that denial. *Beets v. State*, 110 Nev 339, 871 P.2d 357 (1994).

On September 29, 2000, the state district court held an evidentiary hearing on Beets's petition. On February 20, 2002, the state district court entered an order denying relief. Beets appealed. On October 7, 2003, the Nevada Supreme Court affirmed the lower court's denial of his petition, but directed Beets to file a separate petition in state district court raising a claim pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002). According to Beets's current motion, he filed that state petition on January 27, 2004, four days after he filed the petition that initiated this action.

III.     Standards Governing Discovery in Habeas Corpus Actions

Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts states: "A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." The Supreme Court has construed Rule 6, holding that if through "specific allegations before the court," the petitioner can "show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

4

1    The Ninth Circuit Court of Appeals has pointed out that "[a] habeas petitioner does

2   not enjoy the presumptive entitlement to discovery of a traditional civil litigant." *Rich v. Calderon*,

3   187 F.3d 1064, 1068 (9th Cir. 1999) (citing *Bracy*, 520 U.S. at 903-05). "Rather, discovery is

4   available only in the discretion of the court and for good cause shown...." *Id*. The court instructed:

5           Habeas is an important safeguard whose goal is to correct real and
            obvious wrongs. It was never meant to be a fishing expedition for
6           habeas petitioners to "explore their case in search of its existence."

7   *Rich*, 187 F.3d at 1067. Accordingly, a habeas petitioner will not be granted leave to conduct

8   discovery based on allegations that are purely speculative or without any basis in the record. On the

9   other hand, a petitioner is not necessarily required to plead specific facts entitling him to habeas

10  relief *prior* to obtaining leave to conduct discovery.

11          Indeed, based on the the Supreme Court's decision in *Bracy*, a petitioner may be able

12  to establish "good cause" for discovery even though he posits only a plausible "theory" for relief. In

13  *Bracy*, the petitioner sought discovery to support a claim that, because the judge in his case was

14  convicted of taking of bribes from some criminal defendants, he was prone to "a sort of

15  compensatory bias against defendants who did not bribe [him]." *Bracy*, 520 U.S. at 905. Although

16  the petitioner had not alleged facts sufficient to establish that his particular case was infected by such

17  bias, the Supreme Court found that he was nonetheless entitled to conduct discovery based on

18  evidence that "lend[ed] support" to an actual bias claim. *Id*. at 909. Thus, a petitioner seeking leave

19  to conduct discovery is not required to show that the requested discovery is likely to lead to habeas

20  relief, only that there is "reason to believe" that it "may" do so. *Id*. at 908-09.

21  IV.    Analysis

22          Beets identifies six theories of relief he seeks to explore by means of discovery. He

23  asks permission to conduct discovery to assist him in showing: (1) that trial counsel were ineffective

24  in failing to present mitigation evidence, (2) that he is ineligible for the death penalty because he is

25  mentally retarded, (3) that the imposition of his death sentence by a three-judge panel violated his

26  right to a reliable sentencing determination, (4) that he was denied his right to meaningful appellate

5

review and an impartial jury, (5) that the state failed disclose material exculpatory and impeachment

evidence, and (6) that lethal injection as implemented in Nevada constitutes cruel and unusual

punishment.  Beets supports each of these requests with factual allegations that are discussed below

to the extent necessary to address his discovery requests.  In addition, Beets has submitted, with his

motion, the proposed subpoenas he intends to serve should the court grant him leave to conduct the

discovery he requests.  Docket #19-21.

Under the rubric of claiming that Beets has failed to meet the discovery standard

articulated in *Bracy*, respondents raise several objections to granting Beets leave to conduct

discovery.  First, respondents contend that Beets has not established "good cause" for discovery

because he has not properly placed cognizable habeas claims before this court in the manner

prescribed by Rule 2 of the Rules Governing Habeas Corpus Cases Under Section 2254.[2]

Filed prior to appointment of counsel, Beets's petition does not contain grounds for

relief drafted specifically for this federal habeas proceeding.  Docket #1.  Instead, it simply

incorporates by reference the constitutional claims raised in his attached state appellate briefs.  *Id*.

According to the respondents, this form of pleading is fatal to Beets's motion to conduct discovery

because he is unable to link any of his proposed discovery requests to a specified claim in a properly

pleaded petition.  Alternatively, respondents argue that, even if the court were to forgive Beets's

pleading format, he seeks discovery for claims not contained in the incorporated state court briefs.

Respondents have not directed the court to any controlling authority that states that

the "claim" for which a petitioner seeks discovery must be contained within the four corners of his

habeas petition.  Rule 6 imposes no such a requirement.  The Supreme Court in *Harris* and in *Bracy*

spoke of the petitioner placing "specific allegations before the court," but neither case specifically

holds that the allegations must be located in the habeas petition, as opposed to a motion for leave to

conduct discovery or other appropriate document filed with the court.  *Bracy*, 520 U.S. at 908-09;

---

[2] Respondents objection to Beets's pleading format also serves as the basis for their motion to dismiss his habeas petition.  See discussion in section VI, below.

6

1   *Harris*, 394 U.S. at 300.  The respondents having advanced no persuasive reason to do  otherwise,

2   this court shall consider factual allegations set forth in Beets' discovery motion in determining

3   whether he has established good cause for the discovery he requests.

4          Next, respondents note that Beets seeks discovery for claims that are unexhausted or

5   that are procedurally defaulted.  Though not cited by the respondents, there are a few Ninth Circuit

6   cases, decided pre-*Bracy*, that support the position that discovery should only be permitted in

7   relation to claims for which the petitioner has exhausted state court remedies.  *See*, *Calderon v.*

8   *United States District Court* (*Roberts*), 113 F.3d 149 (9th Cir. 1997); *Calderon v. United States*

9   *District Court* (*Hill*), 120 F.3d 927 (9th Cir. 1997); *Calderon v. United States District Court*

10   (*Nicolaus*), 98 F.3d 1102 (9th Cir. 1996).  In each of those cases, however, there is at least one salient

11   procedural fact that makes the case distinguishable from the present case.  (In *Hill*, for example, the

12   petitioner had "yet to file a petition for habeas corpus relief in state or federal court" before seeking

13   discovery in federal court.  120 F.3d at 928.)  In addition, it is at least arguable that *Bracy* broadened

14   the habeas court's discretion by permitting discovery based on a showing of "good cause" alone,

15   without requiring the court to first delve into and resolve more complex procedural issues, such as

16   exhaustion and procedural default.  *See McDaniel v. United States District Court* (*Jones*), 127 F.3d

17   886, 888 (9th Cir. 1997).  Thus, while the procedural viability of a petitioner's claims may be a

18   legitimate factor for the court to consider in deciding whether to allow discovery, this court is not

19   convinced that it is precluded from allowing Beets to conduct discovery until it is satisfied that his

20   claims for relief will be free from procedural impediments.

21          Respondents also contend that the court should deny Beets' request to conduct

22   discovery because he failed to develop the facts in support of his claims while in state court.  In

23   making this argument, respondents rely primarily on *Williams v. Taylor*, 529 U.S. 420 (2000),

24   wherein the Supreme Court addressed the habeas petitioner's obligation to diligently seek factual

25   development of his claims in state court.  *Id*. at 437.  The issue presented in *Williams* was whether

26   the petitioner was barred from obtaining an evidentiary hearing under 28 U.S.C. § 2254(e)(2).  *Id*. at

424.

The determination as to whether the district court may or must hold an evidentiary hearing is separate and distinct from whether the court shall, in its discretion, permit a petitioner to conduct discovery. *Jones v. Wood*, 114 F.3d 1002, 1009 (9ᵗʰ Cir.1997). Although *Jones v. Wood* was decided under the pre-AEDPA[3] version of section 2254, respondents have cited the court to no controlling or persuasive authority that § 2254(e)(2) restricts discovery in the same manner that it restricts evidentiary hearings. And, as with the exhaustion and procedural default analyses, the § 2254(e)(2) analysis implicates issues that the court, in its discretion, chooses to not address at this stage of the proceedings.[4] Accordingly, the court shall not deny Beets's discovery request based respondents' unsubstantiated contention that Beets failed to pursue the factual development of his claims in state court.

The court now turns to the theories of relief for which Beets's seeks discovery and the specific requests he makes in relation to each theory.

A. Trial counsel were ineffective in failing to present mitigation evidence.

In his motion, Beets alleges that his trial counsel were ineffective failing to investigate and present mitigating evidence, specifically, information regarding his mental illness and developmental limitations. He claims that he was prejudiced by counsel's ineffectiveness in this regard because "it prevented counsel from proving that [he] was not competent to stand trial, that his mental state was insufficient to find the specific intent necessary for premeditation, and that his moral culpability did not rise to the level necessary for imposition of the death penalty." Docket #18, p. 27. In relation to this ineffective assistance claim, Beets also alleges that policies and practices, as well as budget and staffing issues, within the Clark County Public Defenders' Office

---

[3] Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214.

[4] For example, the court would need to resolve the threshold issue of whether "there [was] lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 437. Because the complete state court record has yet to be filed herein, the court is currently unable to conduct that inquiry.

1   adversely impacted counsel's ability to effectively develop mitigation evidence on Beets's behalf.

2   Based on the evidence placed before it thus far, the court reserves doubt that Beets

3   will be able to show that his mental impairments rendered him incompetent to stand trial or unable to

4   form the specific intent necessary for premeditation.  Nonetheless, Beets has provided sufficient

5   reason to believe that a more thorough investigation and presentation of mental health evidence by

6   counsel may have benefitted his chances for a more favorable outcome in the penalty phase of his

7   trial.  Accordingly, the court will permit to Beets to conduct requested discovery as follows.

8   The court will grant Beets's request for permission to depose the following

9   individuals: (1) E. Eugene Martin, the attorney who represented Beets in pre-trial proceedings and

10  who conducted the mitigation investigation; (2) Thomas Casler, investigator for Beets's state habeas

11  counsel; (3) William Evans, Beets's elementary school principal when Beets was in the fifth and

12  sixth grade; and (4) Cranford Crawford, Beets's juvenile probation officer.

13  The court will not grant Beets's request for permission to depose Shirley Barber, a

14  teacher and administrator at an elementary school Beets attended, or J.D. Beets, Beets's uncle.  The

15  declarations that Beets has offered in support of his request to depose these individuals fail to

16  establish that either would have information to offer that would be particularly helpful to Beets's

17  pursuit of habeas relief.  See J.D. Beets's Declaration, Exhibit 3.04, and Barber's Declaration,

18  Exhibit 3.42.[5]  Unlike the declaration of William Evans (Exhibit 3.41), which contains fairly specific

19  details about Beets's academic performance, mental and functional capacity, and learning

20  impairments, Barber's declaration contains only scant, non-specific information about Beets's

21  personality and his IQ.  And, while J.D. Beets's declaration recounts a change in his nephew's

22  behavior and personality attributable to a tragic train accident when Edward was five years old, the

23  declaration fails to establish that J.D. had any appreciable contact with Edward after the age of six.

24  As for Beets allegations about institutional constraints within the Clark County Public

25

26      [5]  Unless otherwise noted, the "Exhibits" referred to herein were submitted with Beets's
discovery motion and are located at docket #19 through #40.

1   Defenders' Office, the court views these allegations as being a step removed from the question of

2   whether Beets is entitled to habeas relief due to ineffective assistance of counsel.  Even if proven,

3   these allegations would not help establish *whether* counsel's performance fell below the

4   constitutional standard.  At most, they would only provide a reason *why* counsel's performance was

5   compromised to such an extent.  Accordingly, the court will decline Beets's request for permission

6   to depose Morgan Harris, the Public Defender for Clark County at the time of Beets' arrest and trial.

7   Beets's request to depose the custodian of records for the NDOC is also denied.

8   Beets states that he wishes to depose this person "to obtain discovery regarding [NDOC's] record

9   storage and retention policies."  He contends that, because the NDOC does not maintain all of his

10   records in one location, this proposed deposition will assist him in showing that trial counsel was

11   ineffective in failing to investigate and present the allegedly decentralized records at trial.  Failing to

12   discern a sufficient nexus between the NDOC's record-keeping policies and the question of trial

13   counsel's ineffectiveness, the court does not find good cause to authorize the deposition.

14   The court will, however, permit Beets to serve his proposed subpoena duces tecum on

15   the Nevada Highway Patrol (Exhibit 1.10).[6]  This subpoena is seeks production of records

16   concerning Beets that are maintained in the state's Central Repository for Nevada Records of

17   Criminal History.  *See* Nev. Rev. Stat. 179A.075.  While Beets has not shown that the repository is

18   likely to contain records that would bear upon whether counsel was ineffective for failing to

19   investigate his alleged mental limitations, the court is of the opinion that such records should be

20   available to a capital habeas petitioner to the extent that they document his personal information and

21   criminal history.

22   With respect to Beets's remaining discovery requests relating to his ineffective

23   assistance claim, the court shall permit him to subpoena a copy of his work records from Caesar's

24

25   _____

26   [6]  The court notes, however, that Item 8 (regarding electronic data) in Attachment A of the proposed subpoena would, as drafted, impose an unreasonable burden on the responding party.  As such, Beets shall be required to edit the subpoena as set forth in the court's orders below.

1  Palace (Exhibit 1.09) and the audio tape of a conversation between himself and his counsel that was

2  admitted into evidence in the state district court (Exhibit 1.13).  And, while the court will permit

3  Beets to serve subpoenas on two Las Vegas television stations, he shall be limited to requesting only

4  video or audio footage that captures either himself or his court proceedings.  Exhibits 1.14 and 1.15.

5                    B. Beets is ineligible for the death penalty because he is mentally retarded.

6            Beets alleges that he is ineligible for the death penalty based on *Atkins v. Virginia*,

7  536 U.S. 304 (2002), wherein the Supreme Court held that the Eighth Amendment prohibits the

8  execution of a mentally retarded person.  As noted above, Beets is currently pursuing relief under

9  *Atkins* in the Nevada courts.  According to Beets, the state district court granted him discovery of

10  records maintained by the Nevada Department of Corrections (NDOC) and Ely State Prison (ESP),

11  but subsequently limited the scope of that discovery pursuant to a motion filed by the NDOC.  Beets

12  now asks this court to grant him permission to conduct the broader discovery initially permitted by

13  the state court.

14            Granting this request would inevitably result in NDOC raising the same objections in

15  this court that it did in the state district court.  Beets has offered no explanation or argument as to

16  why the state court's discovery ruling was erroneous or why this court would be required to resolve

17  the dispute in a different manner.  Indeed, Beets has not even apprised this court of the specific

18  grounds for NDOC's objections or the basis upon which the state court sustained them.[7]  While

19  recognizing that it would not necessarily be bound by the state court's ruling (*see Breed v. United*

20  *States District Court*, 542 F.2d 1114, 1115 (9th Cir.1976), this court is not inclined to invite re-

21  litigation of the NDOC's objections in the absence of any showing that outcome would be different.

22  Therefore, the court will not authorize Beets to serve his proposed subpoena duces tecum on the

23  custodian of records at ESP (Exhibit 1.16).

24

25         [7]  Beets's motion contains citations to the state court's discovery orders, but his counsel
26  apparently did not see fit to include copies of the orders among the numerous exhibits submitted with
    the motion.  Docket #18, p. 33.

C.  The imposition of his death sentence by a three-judge panel violated Beets's right
to a reliable sentencing determination.

Beets asserts that the procedure used to select the members of the three-judge sentencing panel in Nevada capital cases was not random and resulted in use of "death prone sentencers."  In a dissenting opinion on Beets' direct appeal in the Nevada Supreme Court, Justice Young concluded that Nevada's use of three-judge panels in death penalty cases[8] did not meet constitutional standards established by the United States Supreme Court because the procedure failed to distinguish cases in which the death penalty was warranted from those which it was not  *Beets v. State*, 107 Nev. at 976, 821 P.2d at1057-58 (citing to *Godfrey v. Georgia*, 446 U.S. 420, 427 (1979)).  Blaming Nevada's system of elected judges, Justice Young posited that three-judge panels imposed the death penalty with far more frequency than juries because judges typically seek to curry favor with voters by being tough on crime.  *Id.*

The claim for which Beets now seeks discovery is based on a markedly different theory than the one discussed by Justice Young in his dissent.  Instead of pointing to Nevada's system of popularly-elected judges as the reason for three-judge panels being death-prone, Beets alleges that the panel selection procedure itself has historically produced a slant toward picking those judges who are disposed toward imposing death.  While not swayed by Beets's insinuation that the selection process resulted in the selection of racially-biased panels, the court finds that he has nonetheless advanced a plausible theory for habeas relief that warrants additional factual development.  *See Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (process that results in the selection of jurors who fail to consider aggravating and mitigating circumstances in good faith violates the Due Process Clause).

In an effort to develop this theory, Beets asks the court to permit him to serve a

---

[8]  Nevada law at the time mandated the use of three-judge panels when the jury was unable to reach a unanimous sentencing verdict for a defendant convicted of first degree murder or when the defendant had entered a guilty plea to first degree murder.  *Beets,* 107 Nev. at 974-75, 821 P.2d 1056.

1   subpoena duces tecum requesting the Clerk of the Nevada Supreme Court to produce records

2   showing the manner in which three judge-panels were selected.  Exhibit 1.12.  Having reviewed the

3   proposed subpoena, the court finds the scope of Beets's request to be far too broad.  Rather than

4   requesting materials concerning the selection process throughout its entire history, Beets shall be

5   limited to requesting only those materials that bear upon the selection process used in his particular

6   case.

7   　　　　　　　　　　D.  Beets was denied his right to meaningful appellate review and an impartial jury.

8   　　　　　　　　　Beets alleges that he was denied his constitutional right to meaningful appellate and

9   post-conviction review of the jury selection portion of his trial because the trial court denied his

10  counsel's request to transcribe those proceedings.  He also alleges that his right to a fair trial and

11  impartial jury was violated as well.  According to the declaration of Beets's trial counsel Stephen

12  Dahl, he (Dahl) designated that a transcript of the jury voir dire proceedings be included as part of

13  the record for direct appeal.  Exhibit 4.30.  Dahl also stated in his declaration that he prepared an

14  order directing the court reporter to prepare the transcripts he had designated, but that order was

15  subsequently edited (in handwriting), by someone other than himself, to exclude the transcript of jury

16  selection.  *Id*.  The order was signed by the trial judge, Charles Thompson, and Dahl surmised in his

17  declaration that Judge Thompson was the one who modified the order.  *Id*.; Exhibit 4.20.

18  　　　　　　　　　Based on a declaration of the court reporter, the transcripts at issue (or the source

19  from which they might be prepared) were likely destroyed several years ago in the accordance with

20  her standard practice.  Exhibit 4.16.  Accordingly, Beets now requests that this court grant him

21  permission to request prosecutor Dan Seaton's trial notes of the jury voir dire.  For the reasons that

22  follow, the court shall deny Beets's request.

23  　　　　　　　　　First, Dahl's declaration contains only speculation as to why he wanted the transcripts

24  in the first place.  Exhibit 4.30.  Rather than identifying a specific issue he wanted to pursue, Dahl

25  stated in his declaration that he "wanted to look carefully at the transcript to see if there were any

26  constitutional claims to raise."  *Id*.  Dahl further stated that, in the several cases in which he opposed

1    Mr. Seaton, he was frequently concerned about Seaton's use of peremptory challenges *vis a vis*

2    *Batson v. Kentucky*, 476 U.S. 79 (1986).  *Id.*  However, Dahl apparently has no recollection of a

3    *Batson* issue arising in Beets's case, nor do his own notes of the proceedings reflect that a *Batson*

4    objection was ever interposed.  *Id.*

5            Second, Beets's allegations in support of this discovery request do not establish a

6    reason to believe that he may be entitled to habeas relief based either on the manner in which the jury

7    was selected in his case or on the fact that the transcripts at issue were not available for appellate or

8    post-conviction review.  Other than Dahl's recollection that he had "concerns" about the jury

9    selection process, the only allegations Beets proffers to show that jury selection may have been

10   improper are that the selection process took only a half day to complete and that one of the struck

11   jurors was African-American.  Docket #18, p. 41.  According the declaration of investigator Robert

12   Beall, however, the racial make-up of the group of potential jurors who were not selected was the

13   same as that of the group of jurors who were selected.  Exhibit 4.25.

14           Lastly, Beets has not established that the notes he seeks, to the extent that they exist,

15   are likely to contain a faithful recapitulation of the jury selection proceedings.   In sum, the court

16   finds Beets's allegations regarding jury selection to be highly speculative and without evidentiary

17   support.  As such, Beets has not shown good cause for discovery of the prosecutor's trial notes

18   relating to the voir dire process.

19                   E.  The state failed disclose material exculpatory and impeachment evidence.

20           Beets claims that good cause exists for him to obtain discovery to show that state

21   failed to disclose material exculpatory and impeachment evidence in the prosecution of its capital

22   case against him.  However, rather than put forth specific allegations that might, with further

23   development, give rise to a claim for relief under *Brady v. Maryland*, 373 U.S. 83 (1963), and its

24   progeny, Beets points to three unrelated examples of the state's alleged failure to disclose evidence

25   or information in his case.  None of these three examples, either alone or in concert, rises to the level

26   of a constitutional violation worthy of habeas relief.  Beets also relies heavily on what he terms "a

14

1  pattern and practice in capital cases prosecuted by the Clark County District Attorney's Office of

2  failing to comply with constitutional disclosure obligations."  Docket #18, pp. 41, 45-52.

3  The discovery Beets seeks based on the foregoing is complete disclosure of all

4  records remotely related to him and his crimes that might be in the possession of the Clark County

5  District Attorney's Office (CCDA) and five different divisions within the Las Vegas Metropolitan

6  Police Department (LVMPD).  Exhibits 1.01-1.05, 1.08.  Beets relies on *U.S. v. Blanco*, 392 F.3d

7  382, 394 (9th Cir. 2004), to argue that, because he has unearthed a few pieces of evidence or

8  information that should have been disclosed pursuant to *Brady*, there is a presumption that the state

9  is concealing additional exculpatory and impeachment evidence.  Thus, according to Beets, this court

10  must allow full discovery from CCDA and LVMPD "for prophylactic reasons."

11  *Blanco* does not provide a basis for allowing the wide-ranging discovery Beets seeks

12  in this case.  First, the Ninth Circuit's remand order in *Blanco* that the government "produce all

13  information in its possession pertaining to [a confidential informant]" was based on a finding that the

14  government had, in fact, suppressed information that should have been given to Blanco under *Brady*

15  and *Giglio*.[9]  *Blanco*, 392 F.3d at 397.  Here, it is far from clear that the CCDA committed a *Brady*

16  or *Giglio* violation in prosecuting Beets.  At most, the three instances of alleged non-disclosure cited

17  by Beets show that the state could have been more fastidious in complying with its purported "open

18  file" policy.  Second, even in *Blanco*, the court did not order the disclosure of the prosecution's

19  *entire* file.  Instead, the government was only required to produce information in its possession that

20  pertained to the confidential informant.  *Id.*

21  Beets's "pattern and practice" argument is one that is not new to this court.  The

22  Federal Public Defender's Office in this district has routinely advanced this theory to support a

23  request for broad-based discovery in any section 2254 capital habeas case that originated in Clark

24  County.  The argument consists of two components: (1) The CCDA has a well-established history of

25

26  [9] *Giglio v. United States*, 405 U.S. 150 (1972).

15

1    not complying with its constitutional disclosure obligations in criminal cases; and, (2) the CCDA

2    does not have a system in place to ensure that possible *Brady* material in the possession of various

3    law enforcement agencies is turned over to the defense.  According to petitioner, these two premises

4    warrant plenary discovery of the records of any agency that may have played a role in his

5    prosecution.

6             In the past, this court has, in *some* cases, reached the conclusion that the foregoing

7    "pattern and practice" argument established "good cause" to allow *some* discovery in support of

8    either a substantive *Brady* claim or a claim that counsel was ineffective in pursuing pre-trial

9    discovery.  *See*, *e.g.*, *Paine v. McDaniel*, 2:02-CV-1082-KJD-PAL, Order Regarding Discovery,

10    Docket #33, p. 8-16.  Here, because Beets's offers only a vague and highly speculative theory upon

11    which he may be entitled to habeas relief, the court shall substantially limit the discovery he will be

12    allowed to undertake in this area.  In so ruling, the court takes instruction from *Bracy* where the

13    Supreme Court suggested that habeas discovery was not necessarily warranted based merely on the

14    fact that the trial judge had been convicted of taking bribes from defendants in criminal cases:

15             . . . We emphasize, though, that petitioner supports his discovery request by
16        pointing not only to Maloney's conviction for bribe taking in other cases, but also to additional evidence, discussed above, that lends support to his claim that Maloney was actually biased *in petitioner's own case*.  That is, he presents "specific
17        allegations" that his trial attorney, a former associate of Maloney's in a law practice that was familiar and comfortable with corruption, may have agreed to take this
18        capital case to trial quickly so that petitioner's conviction would deflect any suspicion the rigged *Rosario* and *Chow* cases might attract. . . .
19

20    *Bracy*, 520 U.S. at 909 (emphasis in original).  As discussed above, Beets has made a very weak

21    showing that the prosecution in his case failed to disclose material exculpatory or impeachment

22    evidence.

23             Under these circumstances, the court will not condone a discovery request that would

24    require the CCDA and various divisions of the LVMPD to scour its records for every shred of

25    information or material relating to Beets and his crimes.  Instead, the court shall limit Beets's

26

discovery request to a copy of the CCDA criminal file for this particular case,[10] as maintained by the

CCDA in the usual course of business.  In addition, the CCDA shall be permitted to withhold from

disclosure materials and information that would not have been subject to discovery in the original

state court case – e.g., attorney notes, legal research, internal memoranda, etc.  If, at some point,

Beets can make a more convincing showing that he may be entitled to habeas relief due to the state's

failure to disclose exculpatory or impeachment evidence, he may renew his request for leave to

conduct discovery.

> F.  Lethal injection as implemented in Nevada constitutes cruel and unusual punishment.

Claiming that Nevada's lethal injection protocol results in the infliction of

unnecessary pain, Beets requests permission to conduct discovery for the stated purpose of showing

how the State of Nevada intends to carry out his death sentence.  Accordingly, he asks for permission

to serve a subpoena on the NDOC that would call for the production of any and all documents in the

Department's possession that would have any bearing whatsoever on Nevada's execution protocol.

Exhibit 1.25.  In making this request, Beets notes that, historically, the NDOC has kept confidential

some of the records he now seeks to obtain.  In addition, he asks for leave to depose the Director of

the NDOC, the Medical Director of the NDOC, the warden of Nevada State Prison, and the Carson

City Fire Chief.  Exhibits 1.26-1.29.

By statute, Beets's death sentence is to be carried out by lethal injection.  *See* Nev.

Rev. Stat. 176.355.  Section 176.355(2) assigns the Director of the NDOC several tasks to perform in

relation to executing the death penalty.  *Id.*  However, neither the Nevada statutes nor the state

court's sentence in this case require that a specific protocol be followed in administering the lethal

injection itself.  Instead, the particular procedures to be used, including the selection of the drug or

---

[10]  While the CCDA has most likely has assigned its own file number to the case, this court is referring to the state's prosecution of state justice court case # 89-FN-00193 and state district court # 89-C-088206-C.

drugs to be administered, are a matter left to the Director of the NDOC after consulting with the state health officer . *Id*.

While this scheme would seem to justify some inquiry into the specifics of the NDOC protocol, it also prompts the question of whether Beets's challenge, to the extent that it has been articulated, might be more properly raised in the context of an action brought under 42 U.S.C. § 1983. In *Nelson v. Campbell*, 541 U.S. 637 (2004), a state prisoner sentenced to death filed a civil rights action under § 1983 alleging that the state's proposed use of a certain procedure, not mandated by state law, to access his veins during the lethal-injection procedure constituted cruel and unusual punishment. The U.S. Supreme Court reversed the lower courts' conclusion that the claim sounded in habeas corpus and could not be brought as a § 1983 action. Although *Nelson* explicitly states that it leaves unresolved the question as to whether a general challenge to a statutorily mandated method of execution "would call into question the death sentence itself," the Court concluded that § 1983 was the appropriate vehicle for the prisoner to challenge the particular lethal-injection procedure proposed by state officials. 541 U.S. at 645. The Court stated that the prisoner's suit challenging "a particular means of effectuating a sentence of death does not directly call into question the 'fact' or 'validity' of the sentence itself [because by altering the lethal-injection procedure] the State can go forward with the sentence." 541 U.S. at 644.

More recently, in *Hill v. McDonough*, --- U.S. ---, 126 S.Ct. 2096 (2006), the Court reaffirmed the principles in *Nelson*. Upholding the use of § 1983 to challenge a three-drug lethal-injection procedure proposed in Florida, the Court in *Hill* noted that, under Florida law, implementation of lethal injection was left to Florida's department of corrections. 126 S.Ct. at 2102. While neither *Nelson* nor *Hill* hold that habeas corpus relief is unavailable to a prisoner seeking to invalidate a particular lethal injection procedure, both cases suggest that a § 1983 claim may be the more appropriate avenue where, as in this case, the particular procedure under scrutiny is the not the only means by which the state is permitted to carry out the sentence. *See also*, *Beardslee v. Woodford*, 395 F.3d 1064, 1068-69 (9th Cir. 2005) (Death row inmate's claim that California's lethal

1  injection protocol violates the Eighth and First Amendments "is more properly considered as a

2  'conditions of confinement' challenge, which is cognizable under § 1983, than as a challenge that

3  would implicate the legality of his sentence and thus be appropriate for federal habeas review.").

4          Until Beets's challenge to the Nevada lethal injection protocol is set forth in a formal

5  pleading, this court shall reserve judgment as to whether the claim must be brought as a habeas claim

6  or as a § 1983 claim.  Until that time, this court is not inclined to abide the hard-fought and

7  protracted discovery dispute that would inevitably result if Beets were granted permission to

8  subpoena extensive records from the NDOC.  Thus, in the interest of moving this case forward to, at

9  least, the filing of the amended petition (see docket #52), Beets's discovery request as it relates to

10  Nevada's lethal injection protocol shall be denied at this point in the proceedings.  *See Lonchar v.*

11  *Thomas*,  517 U.S. 314, 325-26 (1996) (recognizing the substantial discretion afforded the district

12  court by the habeas rules in the conduct of a case, including the decision whether to allow

13  discovery).  As with the denial of Beets's request to conduct discovery of possible *Brady* evidence,

14  the court's denial of discovery regarding Nevada's lethal injection protocol does not foreclose Beets

15  from renewing his request, as appropriate, at some future point.

16  VI.    Respondents' Motion to Dismiss

17          Respondents have moved to dismiss this action on the ground that Beets has not filed

18  a habeas petition that complies with Rule 2 of the Rules Governing Habeas Corpus Cases Under

19  Section 2254.  As noted above, Beets's petition does not contain grounds for relief drafted

20  specifically for this federal habeas proceeding.  Docket #1.  Instead, it simply incorporates by

21  reference the constitutional claims raised in his attached state appellate briefs.  *Id*.  Respondents

22  argue that Beets's filing does not constitute a "petition" as contemplated by Rule 2 and, more

23  specifically, that it deviates from the standard format called for by Rule 2(d).

24          Respondents cite no legal authority for the position that a pleading that fails to

25  comply with Rule 2 must be dismissed.  Prior to being amended in 2004, Rule 2(e) provided for the

26  return of insufficient petitions.  However, that provision was eliminated to preclude the harsh result

1  of a subsequent petition being barred under the 28 U.S.C. § 2244(d)(1). *See* Advisory Committee

2  Notes for Habeas Rule 2, 2004 Amendments. The habeas rules are now designed for the court to

3  allow the defective petition and to require the petitioner to submit a corrected petition. *Id.*

4          Thus, even assuming that Beets's current petition is insufficient under Rule 2, the

5  habeas rules do not call for dismissal. The scheduling orders governing this case call for Beets to

6  file an amended petition, with the assistance of counsel, at the conclusion of the initial discovery

7  phase. Docket ##12/52. Accordingly, the court shall deny respondents' motion to dismiss.

8          **IT IS THEREFORE ORDERED** that petitioner's Motion for Leave to Conduct

9  Discovery (docket #18) is **GRANTED IN PART AND DENIED IN PART**, as is further described

10 in this order.

11         **IT IS FURTHER ORDERED** that petitioner is GRANTED leave to serve

12 subpoenas in the form found at Exhibits 1.09, 1.13, 1.18, 1.19, 1.20, and 1.22.

13         **IT IS FURTHER ORDERED** that petitioner is GRANTED leave to serve the

14 subpoena found at Exhibit 1.01, but only after it is edited so that the material to be produced is

15 limited to the CCDA criminal file concerning the prosecution of state justice court case #

16 89-FN-00193 and state district court # 89-C-088206-C, as maintained by the CCDA in the usual

17 course of business. The subpoena shall also clarify that the CCDA is required to disclose only

18 materials and information subject to discovery pursuant to open file discovery or pursuant to *Brady*

19 *v. Maryland*, 373 U.S. 83 (1963), and progeny.

20         **IT IS FURTHER ORDERED** that petitioner is GRANTED leave to serve

21 subpoenas in the form found at Exhibit 1.10, but only after Item 8 of Attachment A is edited to read,

22 "Any of the items above that are maintained as electronic data or in an electronic format.";

23         **IT IS FURTHER ORDERED** that petitioner is GRANTED leave to serve Exhibit

24 1.12, but only after Item 1 of Attachment A is edited so as to limit its scope to materials concerning

25 the actual selection process in Beets's case and the standard procedures in effect at the time;

26         **IT IS FURTHER ORDERED** that petitioner is GRANTED leave to serve Exhibits

20

1.14 and 1.15, but only after Items 3, 4, 5, and 6 of each Attachment A are deleted.

**IT IS FURTHER ORDERED** that petitioner is DENIED leave to serve the subpoenas found at Exhibits 1.02, 1.03, 1.04, 1.05, 1.08, 1.16, 1.17, 1.21, 1.23, 1.24, 1.25, 1.26, 1.27, 1.28, and 1.29.

**IT IS FURTHER ORDERED** that, in all other respects, the schedule for further litigation of this action shall be controlled by the Second Scheduling Order entered on December 15, 2005 (docket #12), as modified by the minute order entered on January 9, 2007 (docket #52).

**IT IS FURTHER ORDERED** that respondents' motion to dismiss (docket #46) is **DENIED**.

DATED:  February 12,  2007

_____
UNITED STATES DISTRICT JUDGE